

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LASALLE BANK NATIONAL ASSOCIATION, f/k/a LaSalle National Bank, | ) ) ) | |
| Appellant, | ) | No. 04 C 4319 |
| v. | ) ) | |
| DOCTORS HOSPITAL OF HYDE PARK, INC., | ) ) | Judge Rebecca R. Pallmeyer |
| Appellee. | ) | |

## MEMORANDUM OPINION AND ORDER

LaSalle Bank National Association appeals from the bankruptcy court's approval of the settlement of claims filed by the Debtor, Doctors Hospital of Hyde Park, Inc., against its sole shareholder, James Desnick. Doctors Hospital filed Chapter 11 bankruptcy in April 2000. On April 15, 2002, Doctors Hospital filed suit as a debtor in bankruptcy against Dr. James Desnick, several Desnick-controlled entities, Daiwa Healthco-2 LLC, LaSalle Bank National Association, and a number of additional individuals. The twenty-eight count complaint asserts various causes of action, including claims for breach of fiduciary duties and claims seeking recovery of fraudulent transfers under both the Illinois Uniform Fraudulent Transfer Act and the fraudulent transfer provisions of Section 545 of the Bankruptcy Code. On March 8, 2004, the debtor filed a motion in bankruptcy court for approval of a settlement between Doctors Hospital, Desnick, the Desnick-controlled entities, and a number of additional individual Defendants (the "Settlement"). Appellant LaSalle National Bank, a creditor of the Estate, objected to the Settlement, arguing that it was not reasonable nor in the best interests of the estate. Bankruptcy Judge Doyle approved the Settlement and LaSalle appeals. For the reasons explained here, the court overrules LaSalle's objections to the proposed settlement and affirms the bankruptcy court's decision.

## FACTUAL BACKGROUND

The underlying litigation arose out of two complex loan transactions involving Doctors Hospital and its affiliates, as well as a series of transactions among Doctors Hospital and a number of entities effectively owned and controlled by Desnick. For the convenience of the reader, the court has attached a chart, prepared and submitted as an exhibit to the Debtor's complaint, which illustrates in summary form the relationships among and ownership of the various corporate entities involved in this litigation.

### History of Doctors Hospital

Doctors Hospital, located on the southeast side of Chicago at 5800 South Stony Island Avenue, was built in 1916 by the Illinois Central Railroad as a component of its employee health insurance plan.[1] (Joint Pretrial Statement on Doctors Hospital's Motion to Approve Settlement With Desnick and Other Defendants; Ex. 6 to Appellant's Brief, hereinafter Joint Pretrial Statement, at 8.) In 1960, after the railroad sold the facility, it became the non-profit Hyde Park Community Hospital. (Id.) In 1992, after the non-profit hospital had ceased operations, Dr. James Desnick purchased the real estate and facilities for approximately $2.4 million. (Id. at 8-9.) Desnick later split off the Hospital's operations from its real estate, titling ownership of the real estate located at 5800 South Stony Island Avenue in the newly created HPCH LLC ("HPCH"), a Delaware Limited Liability Company effectively controlled by Desnick, in August 1997. (Id. at 6,8-9.) Doctors Hospital of Hyde Park, Inc., an Illinois Subchapter S corporation,[2] received title to the assets

---

[1]     The record does not reveal the hospital's original name.

[2]     Doctors Hospital was incorporated on July 31, 1992.   Amended articles of
(continued...)

2

necessary for the operation of the hospital facility, and leased the real estate from HPCH. (*Id.* at 9.) The new hospital was managed by Medical Management of America, Inc. ("MMA"), a Delaware corporation owned and controlled by Desnick. (*Id.* at 7.) Desnick was the sole shareholder and a director of Doctors Hospital at all times prior to its bankruptcy. (*Id.* at 5.)

## The Daiwa Loan

On March 31, 1997, Daiwa Healthco-2 LLC, an affiliate of Daiwa Bank ("Daiwa"), entered into a complex loan transaction in which, among other things, it loaned approximately $23 million to Doctors Hospital. (Joint Pretrial Statement, at 5; Bankruptcy Hearing Transcript, May 18, 2004, Ex. 7 to Appellant's Brief, hereinafter Transcript (Day 1), at 16.) To secure this loan, which was to be used to fund the hospital's operations, the Hospital gave Daiwa a security interest in its receivables. (Joint Pretrial Statement, at 5.) Desnick also furnished a personal guarantee of Doctors Hospital's obligations to the Daiwa Bank affiliate on this loan. (*Id.*) After Doctors Hospital filed for bankruptcy protection, Daiwa filed a claim against the hospital for approximately $9.6 million, as well as a claim against Desnick on his guarantee for the same amount. (Debtor's Prehearing Memorandum in Support of Its Motion to Approve Settlement, Ex. 1 to Appellee's Supplement to the Record, hereinafter Debtor's Pre-hearing Memorandum, at 3.) In a settlement agreement with Daiwa, Desnick paid Daiwa's claim against Doctors Hospital in full. (*Id.*)

---

[2](...continued)
incorporation were filed on August 21, 1997. (Restated Articles of Incorporation, dated Aug. 21, 1997, Ex. 2, Tab 3 to Appellee's Brief.)

## The Nomura Loan and HPCH Lease

On August 28, 1997, Nomura Asset Capital Corporation ("Nomura") originated a loan for $50 million to HPCH (the "Nomura Loan"), the entity from which Doctors Hospital leased the hospital real estate. (Id.) Repayment of the loan was secured by the real estate held by HPCH, as well as the equipment, accounts receivable,[3] and other intangibles owned by Doctors Hospital. The Hospital executed a Guaranty and Suretyship Agreement, dated August 28, 1997, in favor of Nomura for the entire amount of the loan (the "Guaranty"), as well as an Assignment of the Hospital's rights in certain contracts with third parties. In addition, Doctors Hospital executed two additional agreements in which it effectively granted Nomura a security interest in all hospital assets and revenues. (Id.)

On or about August 28, 1997, the same day it entered into the Loan Agreement with Nomura, Doctors Hospital entered into a new 15-year lease with HPCH for the use of the Hospital Real Estate (the "HPCH Lease"). (Id. at 11.) The terms of this lease were an integral part of the Nomura Loan and the underlying rent payments ($472,000 per month) made by Doctors Hospital to HPCH "closely mirrored" the loan repayments. (Transcript (Day 1), at 17; Joint Pretrial Statement, at 11.) The Estate asserts that the Loan would not have been consummated had Doctors

---

[3]     The court is uncertain how both lenders–Daiwa and Nomura–had a security interest in the Hospital's receivables, nor whether Nomura's interest was subordinate to that of Daiwa. The Security Agreements entered into pursuant to the Nomura Loan do not address the matter, (Mortgage, Assignment of Rents, Security Agreements and Fixture Filing by HPCH, LLC to Nomura Asset Capital Corp., Ex. 2, Tab 3 to Plaintiff's Brief), and the Daiwa loan documents have not been presented to the court.

Hospital not executed the lease and that the rent payments under the lease were, in effect, a "pass through" from Doctors Hospital to retire the Loan.[4] (Joint Pretrial Statement, at 11.)

After payments of various fees and costs, the net proceeds of the Loan in the sum of $48,525,749.23 were deposited directly into an account in the name of Desnick and his wife. (Id. at 10.) Desnick subsequently disbursed $2,325,000 to Robert Krasnow, a former employee of Doctors Hospital "with managerial sales responsibilities,"[5] $930,000 to Stephen Weinstein, who served as President of Doctors Hospital from 1993 to 1998, and $1,767,000 to Dan Webb.[6] (Id.) The exact purpose of these payments is unclear. None of the proceeds of the Loan were disbursed to Doctors Hospital, despite the fact that "virtually all of its assets" were pledged to secure the Loan, (Transcript (Day 1), at 17), and its rental payments were servicing the repayment of the Loan. (Joint Pretrial Statement, at 11.)

All of Nomura's title, rights, and obligations in the Nomura Loan have since been deposited into a Real Estate Mortgage Investment Conduit (REMIC) trust whose trustee is LaSalle Bank National Association (hereinafter, "LaSalle" or the "Trust"). (Id. at 11.) As a result, as of October 24, 1997, Doctors Hospital became surety to the Trust under the Guaranty, and the Trust

[4]    LaSalle disputes the characterization. As described below, LaSalle purchased Nomura's rights in the Loan, and the court presumes that LaSalle objects to the characterization of the rent payments as a "pass through" because that characteristic might jeopardize LaSalle's own claim against Doctors Hospital on the guaranty.

[5]    The record does not indicate Krasnow's job title at Doctors Hospital, why he left his position, nor the purpose of the payments.

[6]    The record does not reflect the relationship, if any, between Dan Webb and the Hospital. Court records indicate that Webb served as Desnick's personal attorney in the early 1990s. See Desnick v. American Broadcasting Company, Inc., 44 F.3d 1345 (7th Cir. 1995) (Webb representing Desnick in defamation lawsuit).

5

became the holder of the security interests granted to Nomura. (Id.) The Trust also assumed all rights that had been assigned to Nomura by Doctors Hospital in the Assignment. (Id.) Orix Capital Markets, LLC has been acting as the Trust's special servicer for the loan. (Letter from Orix Capital Markets, LLC to Creditors Committee, dated May 13, 2004, Ex. 2, Tab 25 to Appellee's Brief.)

**Transfers to and From Desnick**

The Estate alleges that throughout Desnick's ownership of Doctors Hospital, he caused funds to be withdrawn from Hospital accounts and paid to himself or to various Desnick-controlled entities (the "Desnick Entities"). Most of these payments took the form of loans or dividends, although the Estate maintains "some were not designated at all." (Debtor's Pre-hearing Memorandum, at 4.) Also during this time, Desnick occasionally transferred cash to Doctors Hospital, either from his own accounts or those of his various entities. Neither party to this appeal suggests that these transfers from Desnick to Doctors Hospital equaled or exceeded the amount of the outgoing transfers, but Desnick himself asserts that he is a net creditor of the Estate in the amount of $1.8 million. For purposes of this decision, it is significant that the vast majority of the transactions of cash out of the hospital occurred prior to the Nomura Loan in August 1997. (Id. at 4-5.)

**Bankruptcy and Litigation**

Doctors Hospital ceased operations and filed a petition under Chapter 11 of the United States Bankruptcy Code on April 17, 2000. *Doctors Hospital of Hyde Park, Inc. v. Dr. James H. Desnick, et al. (In re Doctors Hospital of Hyde Park, Inc.)*, No. 02 A 0036 (Bankr. N.D. Ill. June 7, 2004). [7] (Transcript of Oral Ruling on June 7, 2004, at 4.) On April 15, 2002, Doctors Hospital filed a 28-

---

[7]     Judge Doyle read her opinion into the record. (Transcript of Oral Ruling on June 7, 2005. The court will cite this opinion as "Oral Ruling" followed by the page number.

6

count adversary complaint against various defendants, including Desnick, various Desnick-controlled entities, Daiwa, the Trust, and a number of other individuals. In the complaint, Plaintiffs alleged that the Hospital was left insolvent and ultimately forced to file for bankruptcy because of a series of fraudulent transactions entered into by Desnick and Hospital management to the sole benefit of Desnick, the Desnick Entities, and other Hospital managers, including: (1) the Nomura Loan (described above), in which Doctors Hospital "pledged essentially all of its tangible assets and future earnings for less than reasonably equivalent value or no consideration;" (2) Desnick's withdrawal of at least $15 million from the Hospital between January 1997 and April 17, 2000, money that should have been used for operations expenses; (3) payment of $7.4 million in management fees in 1997 to Medical Management of America, Inc., ("MMA"), a company owned by Desnick, when such fees had been $300,000 or less in previous years and there had been no significant increase or change in the managerial services provided; (4) the HPCH lease payments, which obligated the Hospital to pay rent far in excess of the value of the Hospital's physical facilities; (5) improper management of he Hospital, resulting in government investigations into Medicare overpayments and Hospital liability for almost $2 million in fines, settlements, and legal fees; and (6) numerous transfers of Hospital capital to Desnick, directly and indirectly to entities in his control, in the form of loans, capital withdrawals, dividends, and payments of loans to third parties. (Complaint, dated April 15, 2002, Ex. 2, Tab 1 to Appellee's Brief, hereinafter Compl., at 6-7.)

The 28-count complaint included a variety of causes of action, including: (1) allegations that Desnick and other corporate officers[8] breached their fiduciary duties to Doctors Hospital; (2)

---

[8]     Specifically, Doctors Hospital brought breach of fiduciary duty claims against Stephen
                                                                        (continued...)

allegations that the financial transactions between Doctors Hospital and a number of Desnick-controlled entities violated the Illinois Uniform Fraudulent Transfer Act and constituted fraudulent transfers under § 548 of the Bankruptcy Code and unauthorized transfers under § 549 of the Bankruptcy Code; (3) a claim for recovery of a debt owed Doctors Hospital by Desnick; (4) a count of conversion against Desnick; and (5) a count for equitable subordination of Desnick's claim as a creditor in the Doctors Hospital bankruptcy proceeding. The Estate also brought a claim against the Trust under the Illinois Fraudulent Transfer Act seeking to invalidate the Nomura Guaranty and pledges.

**Other Litigation**

On May 27, 2001, the United States Department of Health and Human Services ("DHHS") filed a claim against Doctors Hospital for $13,395,224.08 (the "Medicare/Medicaid Claim"). This claim is based on payments to Doctors Hospital under the Medicare and Medicaid programs as reimbursements for medical services provided from October 1, 1999 to August 17, 2000. (Debtor's Pre-hearing Memorandum, at 5; Claim of U.S. Department of Health and Human Services: Health Care Financing Administration, filed Mar. 27, 2001.) Under the Medicare/Medicaid program, a provider of services executes a provider agreement and renders services that are covered under the program to eligible beneficiaries. Reimbursement for services rendered is made on an estimated basis as they are incurred. The final settlement is then reached with each provider on a retroactive basis

---

[8](...continued)
Weinstein, President of Doctors Hospital from January 1993 through 1997 and a portion of 1998; Nelson Vasquez, a financial officer of the Hospital; William Barrow, a director of the Hospital; Richard Felbinger, the Hospital's Executive Vice President of Finance; and Michael Nelson, former Chief Financial Officer of the Hospital, in addition to Desnick himself.

at the end of the cost period. To reach this final settlement, providers are responsible for filing an annual cost report documenting the costs actually incurred during the period, which are then compared with the estimate payments made throughout the cost period. Thus, at least initially, Doctors Hospital could have filed a cost report with DHHS justifying the payments made to the hospital, and thus eliminating the claim. Due to the circumstances surrounding the bankruptcy, however, Doctors Hospital did not file the requisite cost report, giving rise to DHHS' claim for the full amount of payments made during the cost period.

On June 25, 2003, LaSalle filed a third-party complaint against Desnick, bringing causes of action similar to those in Doctors Hospital's complaint, but which it believed Doctors Hospital had failed to pursue. The bankruptcy court dismissed those claims, holding that Doctors Hospital alone had standing to assert them. (Appellant's Opening Brief, at 5-6.) Nevertheless, the Trust retains a claim as a creditor of the Estate for approximately $64 million based on the Guaranty provided by Doctors Hospital in conjunction with the Nomura Loan. This claim makes the Trust the Estate's largest creditor. (Appellant's Pre-hearing Brief in Opposition to Settlement, Ex. 4 to Appellant's Brief, hereinafter Appellant's Pre-hearing Brief, at 5.) As noted, the Estate has a claim against the Trust, as well, in which it seeks to invalidate Doctors Hospital's guaranty of the Nomura Loan assumed by the Trust.

**Settlement Agreement**

On March 8, 2004, Doctors Hospital filed a motion for approval of its proposed Settlement with Desnick, the Desnick Entities, and the former corporate officers. This settlement came after four years of on-again, off-again negotiations between the parties. As early as the summer of 2000, almost two years before the Estate filed its complaint, a series of eight to ten meetings were held at

9

which representatives from the Creditors Committee, the Desnick Entities, and various other professional firms[9] met to discuss the events leading to the Hospital's bankruptcy, the various transactions between Desnick and the Hospital, and possible legal theories of recovery. (Transcript (Day 1), at 66-67.) In mid to late 2001, the parties convened a meeting in New York City to discuss settlement possibilities. Present at this meeting were Desnick himself, as well as representatives from the Creditors Committee, American Express, and Daiwa. (Id. at 68-71.) Two more settlement meetings were held in Chicago in late 2001, after the Estate had presented Desnick with a copy of its proposed complaint. (Id.) The negotiations became heated and the meetings were eventually called off. (Id. at 71-72.)

Negotiations resumed in approximately August 2003, at the request of Illinois State Senator Adeline Geokaris, who had previously represented Doctors Hospital and remained its registered agent. (Id. at 74.) At her request, the parties held two more meetings, during which the parties staked out proposed $2 million and $10.5 million settlement figures. (Id. at 77.) John Costello, attorney for the Estate, testified during the bankruptcy hearing that all told, there were six to eight meetings before the parties eventually reached an agreement in late February 2004. (Id. at 78.)

Under the terms of the Settlement agreement, Desnick will pay $6 million to the Estate, plus approximately $131,780, which constitutes the net proceeds from the sale of a parking lot on the Hospital premises in which Doctors Hospital claims ownership. Oral Ruling, at 6. In addition, Desnick agrees to use his "best efforts" to obtain the dismissal or withdrawal of the $13.4 million

---

[9] Among the firms represented at these meetings was American Express, which has been assisting the Estate in its attempt to establish a connection between the Desnick transfers and the Hospital's eventual bankruptcy.

10

claim filed by DHHS as a result of Doctors Hospital's failure to file a Medicare Cost Report during the 1999 to 2000 reporting period. *Id.* If, despite Desnick's best efforts, all or part of this claim survives, Desnick further agrees to pay the Estate up to $1.5 million in addition to the $6 million described above. *Id.* Should Desnick's efforts be so successful that additional sums are recovered by the Hospital, Desnick will share in them. Finally, Desnick agrees to release all claims he has against Doctors Hospital, including any subrogation rights he obtained by paying the Daiwa loan, and to cooperate throughout any remaining litigation against the Trust, Weinstein, and Krasnow. These claims against non-Desnick entities total $16 million. (Transcript (Day 1), at 56-57.) (Settlement Agreement, dated April 1, 2004; Ex. 4 to Appellant's Brief, hereinafter Settlement, at 25.) Desnick continues to deny liability in connection with his conduct prior to Doctors Hospital's filing for bankruptcy filing and, as explained earlier, contends he himself is a creditor of the Estate.

## Estate's Remaining Claims

After the Settlement, the Estate retains claims against three Defendants: the Trust, Weinstein, and Krasnow. Specifically, the Estate retains: (1) a breach of fiduciary duty claim against Weinstein, a former President of Doctors Hospital, relating to the above conduct (Count II); (2) a claim against the Trust seeking to invalidate the Nomura Guaranty and pledges under the Illinois Fraudulent Transfer Act (Count VIII); and (3) claims against the Trust, Weinstein, and Krasnow to recover the HPCH lease and rental payments under the Illinois Fraudulent Transfer Act (Count IX), § 548 of the Bankruptcy Code (Count X).

## Bankruptcy Court Hearing

The Trust filed an objection in the bankruptcy court opposing the Settlement between Doctors Hospital and Desnick. In its objection, the Trust argued that the Settlement sum is not

11

within the reasonable range of litigation possibilities, and thus that the Settlement is not in the best interest of the estate. The bankruptcy court held a hearing on the issue, at which the court considered the deposition testimony of several witnesses, exhibits submitted by the parties, and the live testimony of the Estate's attorney, John Costello. Costello identified several reasons for the Estate's decision to accept the Settlement proposal, including the difficulty of establishing the exact date of Doctors Hospital's insolvency. Costello noted that the Creditors Committees of the Estate had hired financial consultants from American Express who concluded that the Estate could establish insolvency as far back as January 1, 1997. (Transcript (Day 1), at 19-20.) Desnick's expert, in contrast, Navigant Consulting, Inc., estimated the date of insolvency as September 30, 1998. (Id. at 27.) In addition, the annual audits of Doctors Hospital's financial records conducted by KPMG from 1996 through 1999 did not question the solvency of the company as of September 1999. (Id. at 28; Ex. 17 to Appellant's Brief.) And, as the bankruptcy court noted, the Trust itself contends the Hospital was solvent as of August 28, 1997, the date of the Nomura Loan.

The date of insolvency is a critical issue because the majority of the transactions at issue in the lawsuit occurred prior to August 28, 1997, the date of the Nomura Loan. (Transcript (Day 1), at 23.) The parties agree that the Estate cannot recover under its fiduciary duty, fraudulent conveyance, or conversion theories for any transactions that occurred prior to insolvency. (Transcript (Day 3), at 69.) In its complaint, Doctors Hospital alleges that it is entitled to recover approximately $23 million in transfers made between January 1, 1997 and August 28, 1997. These allegedly fraudulent transfers–recoverable only if Doctors Hospital was insolvent during this eight-month period–include $3.9 million of the original Daiwa loan that went to third-party entities controlled by Desnick rather than to Doctors Hospital, a $4.7 million management fee paid to MMA,

$4.9 million borrowed by Desnick from Doctors Hospital, a $1.7 million dividend paid to Desnick for the fiscal year ending September 1997, another $2.4 or 2.5 million dividend during the fiscal year ending 1998, and inflated lease payments to HPCH totaling $472,000 per month.[10] (*Id.* at 23-25.) The net value of the transfers Desnick made into and out of Doctors Hospital after August 28, 1998 is much smaller, totaling just $1.8 million. Oral Ruling, at 9.

Costello noted that proof of insolvency becomes more difficult with the passage of time, (Transcript (Day 1), at 23), and that if the bankruptcy court were to accept Navigant's analysis regarding the date of insolvency, the Estate's claims against Desnick and the Desnick Entities would drop from $23 million to $1.8 million. He concluded that the $6.1 million settlement offered by Desnick was reasonable. Among the other benefits of the Settlement, Costello observed that: (1) the Settlement also entailed the withdrawal of any claims by Desnick against Doctors Hospital both as a creditor and as a result of subrogation rights he obtained through his earlier satisfaction of the Daiwa claim; (2) settlement would eliminate the risk inherent in litigating a complex case, involving complex financial transactions; (3) the Settlement would streamline the ongoing litigation against the remaining Defendants–the Trust, Weinstein, and Krasnow–relating to the hospital's Guaranty of the Nomura Loan and the lease payments to HPCH; and (4) the Settlement enhanced the possibility of eliminating the $13.4 million Medicare/Medicaid claim. (Transcript (Day 2), at 11-15.)

The Trust vigorously contested Costello's estimate of the upper range of reasonable litigation outcomes at the hearing. Oral Ruling, at 10. The Trust contends that the upper range of litigation outcomes should include recovery of the $48 million Desnick received from the Nomura Loan.

---

[10]     Prior to the Nomura Loan closing, the Hospital made rent payments to HPCH directly through Desnick. (Transcript (Day 1), at 24-25.)

13

During the hearing, the Trust questioned the Estate's decision not to sue Desnick to recover the $48 million as a fraudulent transfer or pursue HPCH on an alter ego or substantive consolidation[11] theory, which would recharacterize the loan to HPCH as one to Doctors Hospital. (Transcript (Day 2), at 28-35.) Costello testified, however, that he believed these claims would be risky (presumably because the claims would be inconsistent with the Estate's contention that it is not liable on the Guaranty). Moreover, alter ego claims would be difficult to pursue because, among other things, Doctors Hospital and HPCH were not sufficiently entwined and Costello believed it unlikely that outside parties were confused as to the identity of the parties with which they were dealing. Oral Ruling, at 11.

After the three-day hearing, Judge Doyle concluded that the Settlement falls within the range of reasonable litigation outcomes and is in the best interests of the estate. Oral Ruling, at 7. The court explained that it found Costello's statement that insolvency would be more difficult to establish at earlier dates to be credible, and noted that the Trust presented "absolutely no evidence to contradict Mr. Costello's testimony or show that his analysis of the insolvency issue was unreasonable or unsupported by the evidence . . . ." Id. at 9-10. On the dispute over the upper range of reasonable litigation outcomes, Judge Doyle agreed that Costello's decision not to pursue recovery of the Nomura Loan proceeds was reasonable, in light of the risks in such litigation and the fact that if

---

[11]    Substantive consolidation is a vehicle in bankruptcy "by which the assets and liabilities of one or more entities are combined and treated for bankruptcy purposes as belonging to a single enterprise." J.S. Gilbert, *Substantive Consolidation in Bankruptcy: A Primer*, 43 VAND. L. REV. 207, 208 (1990). It results in "pooling the assets of, and claims against, the two entities; satisfying liabilities from the resultant common fund; eliminating inter-company claims; and combining the creditors of the two companies for purposes of voting on reorganization plans." *In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d 515, 518 (2d Cir. 1988).

Doctors Hospital succeeded on either a substantive consolidation or alter ego theory against HPCH, "LaSalle's guaranty claim would be replaced by the direct loan obligation owed by HPCH to the Trust, swamping the other unsecured creditors of DH who had no link to the misguided loan." *Id.* at 11. Given these considerations, the bankruptcy court concluded that the upper range of reasonable litigation outcomes was approximately $34 million. *Id.* at 13.

Judge Doyle also agreed with Mr. Costello that the $6.1 million settlement figure fell within the range of reasonable litigation outcomes. In addition to the possibility that the Estate would only recover $1.8 million, the court noted a number of factors, including: (1) the complexity of the issues and the costs of litigation; (2) the value to the Estate of Desnick's waiver of his own claims, including any subrogation rights arising out of his payment of the Daiwa loan; and (3) Desnick's agreement to use his best efforts to eliminate the $13.4 million Medicare/Medicaid claim, and agreement to pay 15% of any surviving claim up to $1.5 million. *Id.* at 6-7.

The court rejected the remaining arguments raised by the Trust in opposition to the Settlement. Contrary to the Trust's assertion that the Creditors Committee is "hopelessly non-functional," and thus that the court should not consider its support for the Settlement, the court concluded that the Committee is represented by able counsel and that its view is reasonable. *Id.* at 8. The court similarly dismissed as unsupported the Trust's suggestion that Doctor Hospital's counsel was "tainted" because the case had been referred to them by Winston & Strawn, a law firm that previously represented Desnick and Doctors Hospital. *Id.* The court also rejected the Trust's challenge to the Settlement with the individual defendants besides Desnick and the Desnick Entities, noting that Desnick insisted that the claims against these individual Defendants be dropped because

15

he had agreed in a separate transaction[12] to indemnify the Hospital's insurer, American International Group Technical Services, Inc. ("AIG"), for any losses it incurred under the policy covering these individuals. *Id.* Finally, Judge Doyle observed that the Debtor's counsel was open to "any proposal" under which LaSalle might provide assurance of recovery of the settlement amount, presumably in return for LaSalle's right to pursue the Estate's claims against the Desnick entities. LaSalle is not required to offer such assurance, Judge Doyle noted, but she pointed out that "the Trust may have alternatives available to it if it is utterly convinced that the amount of the settlement is not reasonable." Oral Ruling, at 18.

The Trust now appeals the bankruptcy court's ruling, arguing that the bankruptcy court abused its discretion in approving the settlement because: (1) the Settlement falls below the lowest point in the range of reasonable litigation outcomes; (2) even if it falls within the range of reasonableness, the Settlement produces an unjust result; and (3) the Settlement is not in the best interests of the Estate. The Trust also claims that the court abused its discretion in giving deference to the opinion of the Creditors' Committee and the Trustee, and that the creditors were not given notice of the "actual effect" of the Settlement, and thus had no meaningful opportunity to object. The court will examine these issues in turn.

## DISCUSSION

Bankruptcy courts may approve a settlement in a liquidation proceeding "if the settlement is in the estate's best interests." *In re American Reserve Corp.*, 841 F.2d 159, 161 (7th Cir. 1987)

---

[12]     The terms of this settlement are confidential. The settlement arose out of Doctors Hospital's directors and officers liability insurance policy. (Transcript (Day 1), at 58; Letter from Arent, Fox, Kintner, Plotkin & Kahn, PLLC to AIG dated Aug. 8, 2003, hereinafter AGI Letter, at 1-2.)

(citations omitted). In determining whether a proposed settlement is in the best interests of the estate, courts apply a "two-step methodology." *In re Telesphere Communications, Inc.*, 179 B.R. 544, 553 (Bankr. N.D. Ill. 1994). First, a court must compare the terms of the settlement with the "probable costs and probable benefits" of the litigation. *Id., citing American Reserve*, 841 F.2d at 161. This requires a court to "estimate both the value of the proposed settlement and the likely outcome of litigating the claims proposed to be settled." *Telesphere*, 179 B.R. at 553. Second, a court must determine "'whether or not the terms of the proposed compromise fall within the reasonable range of litigation possibilities.'" *Id., quoting In re Energy Co-Op., Inc.*, 886 F.2d 921, 929 (7th Cir. 1989). This latter determination is "weighted in favor of settlement, since 'a challenged settlement fails this test only if it falls below the lowest point in the range of reasonableness.'" *Id., quoting Energy Co-Op.*, 886 F.2d at 929 (internal quotations omitted).

The proponent of the proposed settlement "has the burden of showing that the settlement terms are in the best interest of the estate." *In re Del Grosso*, 106 B.R. 165, 168 (Bankr. N.D. Ill. 1989), *citing In re Hallet*, 33 B.R. 564, 565-66 (Bankr. D. Me. 1983); *see also Telesphere*, 179 B.R. at 552 (proponent of settlements "bears the ultimate burden of persuasion"). Nevertheless, courts have held the objecting party responsible to "produce some evidence respecting its objections." *Telesphere*, 179 B.R. at 552, *quoting In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983).

## I. Jurisdiction and Standard of Review

This court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 158(a)(1), which vests the district court with jurisdiction over appeals from "final judgments, orders and decrees" of the bankruptcy court. *In re Allied Products Corp.*, No. 03-CV-1361, 2004 WL 635212, *3 (N.D. Ill. Mar. 31, 2004). When reviewing bankruptcy court decisions, the district court acts as

an appellate court. *Bielecki v. Nettleton*, 183 B.R. 143, 145 (N.D. Ill. 1995), *citing* FED. R. BANKR. P. 8013. Accordingly, the district court will review the bankruptcy court's findings of fact for clear error, and its legal conclusions *de novo*. *Dye v. United States*, 360 F.3d 744, 747 (7th Cir. 2004) (citations omitted).

## II.     Bankruptcy Court's Review of the Evidence

As an initial matter, the Trust urges that the bankruptcy court abused its discretion by applying an incorrect legal standard in approving the settlement, failing to review all evidence in the record, and rejecting the Trust's proposed factual findings. None of these arguments is persuasive.

First, LaSalle asserts that rather than comparing the proposed $6.1 million Settlement with the reasonable range of possible outcomes of the litigation against Desnick, the bankruptcy court instead compared the proposed settlement amount with the total amount of outstanding claims of unsecured and priority creditors ($10-14 million). In support of this claim, LaSalle cites a number of instances in which *the Debtor* compares the settlement figure to the amount of outstanding creditor claims. (Appellant's Brief, at 13-14, *citing* Debtor's Pre-hearing Memorandum, at 12; Transcript (Day 2), at 11; Transcript (Day 3), at 9, 31.) Not even Doctors Hospital suggested that this comparison between the settlement figure and the outstanding claims was the appropriate test, however; Doctors Hospital merely cited this comparison as a factor it took into consideration, and repeatedly identified the two-step *Telesphere* approach as the proper standard for the bankruptcy court to apply. (*See, e.g.*, Debtor's Pre-hearing Memorandum, at 12; Debtor's Pre-hearing Memorandum in Support of Its Motion to Approve Settlement, Ex. 6 to Appellee's Supplement to the Record, hereinafter Debtor's Post-hearing Memorandum, at 5, 8.) More importantly, the bankruptcy judge herself never articulated the improper test. She explained: "The court may

18

approve the settlement if it is in the best interest of the estate. The court should compare the settlement terms with the litigation's probable cost and benefits." Oral Ruling, at 3.

Appellant's arguments that the bankruptcy court failed to fully consider all the evidence before it and disregarded proven facts are similarly unpersuasive. Although the factual and legal analysis found in the bankruptcy court's opinion is not extensive, Judge Doyle expressly stated that she considered "all the evidence presented, including exhibits, deposition testimony, and the parties' pre- and post-trial briefs . . . ." *Id.* at 7. Not surprisingly, her discussion focused on the testimony of the lone witness at the hearing, Debtor's counsel, John Costello; but, as Doctors Hospital notes, Costello himself identified and discussed many of the numerous exhibits entered into evidence by the parties. (Appellee's Brief, at 10.) The Trust is correct that a bankruptcy court is obligated to consider all of the facts surrounding a settlement, *American Reserve*, 841 F.2d at 162 ("The bankruptcy judge must apprise himself of all facts necessary to evaluate the settlement . . . ."). That standard does not, however, require the bankruptcy court to specifically cite and discuss each and every exhibit and piece of evidence. Nor is the court persuaded that Judge Doyle's failure to adopt LaSalle's proposed findings requires the conclusion that she erred. LaSalle's objections to the findings that the bankruptcy court did make, on mixed questions of law and fact, are discussed below.

## III. Value of the Settlement

The Trust urges that the bankruptcy court's valuation of the Settlement is clearly erroneous in a number of respects. First, LaSalle asserts that the court failed to consider the reduced portion of the settlement funds that would actually be available to unsecured creditors after accounting for attorneys fees and potential distribution delays. Second, LaSalle claims that Desnick's promise to use his "best efforts" to obtain release of the Medicare/Medicaid claim does not constitute valid

19

consideration for the Settlement. LaSalle also argues that the court failed to assess the possibility that the Medicare/Medicaid claim will not be released and the provision allowing Desnick to recover up to $1.5 million if he does secure release of this claim. Finally, LaSalle believes that the court incorrectly valued Desnick's settlement with Daiwa. The court will address these issues in turn.

## A.  Value of Cash Settlement to Unsecured Creditors

LaSalle does not contest the court's conclusion that the cash value of the Settlement is $6.1 million–consisting of Desnick's payment of $6 million plus the $131,780 held in escrow from the sale of the parking lot–but argues that the court erred in not considering that a substantial portion of this settlement will go to pay professionals. (Appellant's Brief, at 16-18.) Doctors Hospital has conceded that, as of April 16, 2004, some $4.3 million of the settlement will go to pay the professionals and priority claims, leaving just $1.7 million for the unsecured creditors. (Doctors Hospital's Answers to LaSalle Bank's Second Set of Interrogatories, Ex. 8 to Appellant's Brief, at 10.) As LaSalle notes, the amount available to unsecured creditors will only decrease as the litigation drags on. (Appellant's Brief, at 17.)

LaSalle cites *In re Remsen Partners, Ltd.*, 294 B.R. 557 (Bankr. S.D.N.Y. 2003), for the proposition that courts are wary of settlements in which the majority of the settlement will go to pay professionals. Even in *Remsen*, however, where "most of the creditors [were] not likely to get any money from the settlement," the court acknowledged that "[t]his does not mean that [approval of] a settlement must be denied if it would not result in a recovery by general unsecured creditors." *Id.* at 566-67. The *Remsen* court's concern stemmed from the near total lack of recovery for unsecured

20

creditors,[13] and the trustee's failure to alert the estate's creditors that they would likely not recover anything under the settlement. *Id.* at 567. Given this lack of notice, the court held that it would discount the trustee's recommendation and assume that, had they been informed, more creditors would have opposed the settlement. *Id.*

This case presents different circumstances. Even after fees and costs are deducted from the Settlement, the unsecured creditors will still recover a portion of their claims. At the time of the hearing, the unsecured claims total approximately $11.5 million. (Deposition of John Costello, Ex. 4 to Appellant's Brief, Tab A, at 48). After deduction of the professional fees, the creditors can expect to recover only approximately $1.7 million. The Trust correctly notes that the ongoing litigation has likely reduced this sum, but apparently ignores the fact that the Estate has some non-settlement funds available for administrative and legal expenses. (Transcript (Day 2), at 106-07.) In any event, there is no evidence that these additional professional fees have completed eroded the recovery due the unsecured creditors.[14]

Finally, the court notes that the Estate retains claims against a number of remaining defendants, including the Trust itself. Thus, the potential recovery for unsecured creditors is not

---

[13]     Specifically, the court stated that under the proposed settlement, the unsecured creditors "may not receive a distribution, or they may receive a negligible distribution." *Remsen*, 294 B.R. at 563.

[14]     LaSalle also argues that the bankruptcy court did not consider the fact that the Settlement makes no provision as to when the distribution to the unsecured creditors will occur. (Appellant's Brief, at 18.) LaSalle may well be correct that distribution will not occur until all objections are resolved, potentially months or years in the future, but LaSalle has not explained how the bankruptcy court should have weighed this factor. Moreover, the Trust itself presumably has some control over this factor, since its own objection is currently holding up final approval and implementation of the Settlement.

limited to this $1.7 million figure, but rather properly includes a number of remaining claims.[15]

## B. Additional Consideration for the Settlement

In addition to the $6.1 million cash payment, the bankruptcy court noted a number of additional benefits provided to the Estate under the Settlement. Specifically, Judge Doyle noted that, under the agreement, Desnick (1) agrees to use his "best efforts" to obtain the release of the $13.5 million Medicare/Medicaid claim and (2) waives any claims he has against the Estate as a creditor, including any subrogation rights he obtained by paying the Daiwa claim. *Doctors Hospital of Hyde Park, Inc.*, slip op. at *7. Appellant now argues that the Estate failed to produce sufficient evidence demonstrating that these provisions of the Settlement have any value, and that the bankruptcy court erred in holding that they constitute valid consideration for the Settlement.

### 1. Potential Medicare-Medicaid Release

The Medicare/Medicaid claim arose out of the Hospital's failure to submit a final cost report justifying DHHS' expenditures under the programs from October 1, 1999 to August 17, 2000. In the absence of a cost report justifying these payments, DHHS is seeking recovery of all payments made under the programs during this period as a creditor of the Estate. As part of the Settlement, Desnick has agreed to "use his best efforts to negotiate" with DHHS in order to obtain the release or withdrawal of this claim. (Settlement Agreement, at 7.) Desnick has also agreed to file the missing cost report at his own expense, an expense the Estate estimates at approximately $500,000. (Transcript (Day 3), at 7-8.) Moreover, if the claim is not eliminated, Desnick will pay 15 percent

---

[15] Indeed, one of the factors cited by both the Estate and the bankruptcy court in support of the Settlement was that it would streamline the ongoing litigation against the remaining three Defendants—the Trust, Weinstein, and Krasnow. *Doctors Hospital of Hyde Park, Inc.*, slip op. at *7.

of any DHHS claim, up to $1.5 million. The bankruptcy court cited Desnick's agreement to assist in obtaining a release of the DHHS claim and agreement to pay a portion of any remaining claim, as "an additional benefit" to the Estate beyond the $6.1 million cash payment. Oral Ruling, at 15.

LaSalle urges that the bankruptcy court erred in holding that Desnick's promise constitutes valid consideration for the Settlement. (Appellant's Brief, at 18-20.) Specifically, the Trust contends that the Estate did not present any evidence showing that the Medicare/Medicaid claim will be released and that, in any event, Desnick has an independent duty to eliminate the claim as the sole shareholder and former director of Doctors Hospital.

In his testimony, Costello explained that Desnick has hired an attorney specializing in health care law to negotiate with DHHS regarding the claim.[16] (Transcript (Day 1), at 50-51.) According to Costello, DHHS representatives have assured Desnick's attorney that the claim will ultimately be less than $13.4 million. (Id. at 53.) Although the DHHS attorneys did not specify exact figures, they acknowledged that "the claim was not going to ever stand up for $13.4 million" and that DHHS "recognized that all of the payments made by Medicare/Medicaid to the hospital were not improper." (Id.) Regarding this testimony, the bankruptcy court held that "Costello credibly testified that this claim should be significantly reduced if not entirely eliminated." Oral Ruling, at 15.

The Trust nevertheless insists that there is "absolutely no evidence" that Desnick will be able to obtain the release of the Medicare/Medicaid claim. LaSalle observes that the cost report is "hopelessly late" (Appellant's Brief, at 19) under federal regulations which require that such reports

---

[16]     Much of Costello's testimony regarding the efforts to obtain a release of the Medicare/Medicaid claim appears to be hearsay, but there was no specific objection to his testimony on this ground.

23

be filed within 150 days of the last day of the reporting period and permit extensions "only when a provider's operations are significantly adversely affected due to extraordinary circumstances over which the provider has no control, such as flood or fire." 42 C.F.R. 413.24(f)(2). Although Costello testified that Desnick's attorney has indicated that DHHS has accepted late cost reports in insolvency situations, (Transcript (Day 2), at 74), the Estate presented no authority for this proposition.[17] Nor has the Estate addressed the DHHS regulation, which appears to bar submission of late cost reports except in extreme circumstances.[18]

On this record, the court is unable to determine whether Desnick's agreement to seek the release of the Medicare/Medicaid claim has significant value. Against a federal regulation that appears to preclude the filing of late cost reports, the Estate offers only hearsay regarding unofficial conversations with DHHS representatives. Although Judge Doyle found this testimony credible, this court does not believe that Desnick's commitment may be weighed heavily in support of the Estate's burden of proof. *See Del Grosso*, 106 B.R. at 168 (The settlement proponent "has the burden of showing that the settlement terms are in the best interest of the estate.") (citations omitted). Notably, the Estate itself has suggested that it may be possible to obtain a release of the

---

[17]     The court has identified at least one case in which the government extended the cost report deadline due to insolvency. *In re Ludlow Hosp. Soc., Inc.*, 124 F.3d 22, 24 (1st Cir. 1997). The circumstances in *Ludlow* differed significantly from those in the present case, however. There, a bankruptcy trustee obtained two 45-day extensions of the DHHS filing deadline for final cost reports. Significantly, at no point did the hospital in *Ludlow* exceed the filing deadline without first obtaining permission from DHHS.

[18]     Appellant also notes that Doctors Hospital's CEO, a Mr. Brown, has stated that he will not sign the cost report. (Transcript (Day 2), at 76-77.) The Estate similarly fails to respond to this argument, other than to note that LaSalle presents no evidence that Brown is the only person who could sign the report on behalf of Doctors Hospital. (Appellee's Brief, at 16-17.) Neither side has cited any authority concerning the identity of person(s) eligible to file a cost report.

24

Medicare/Medicaid claim without submission of a formal cost report.[19] (Appellant's Brief, at 17; Transcript (Day 3), at 10.) If this is true, Desnick's commitment to prepare the report has little relevance.

LaSalle is troubled by this aspect of the Settlement for other reasons as well. First, LaSalle urges that Desnick has a pre-existing duty to employ his best efforts to resolve the Medicare/Medicaid claims, both as a former director and shareholder of Doctors Hospital, and because, in LaSalle's view, his own conduct created the claim. (Appellant's Brief, at 15.) Doctors Hospital disagrees, arguing that, having resigned as director in November, 2000, Desnick had no ongoing fiduciary duty to cooperate and certainly no duty "to pay up to [$500,000] into a bankrupt estate to fund the filing of a Cost Report because the debtor cannot afford to do so." (Appellee's Brief, at 15.) Neither party cites any case law on a director's ongoing fiduciary duty to a corporation after his resignation, nor has the court found any case law on the issue in its own research. Ordinarily the court would not understand that a corporate owner or director would have a responsibility to comply with regulatory reporting requirements. Assuming that Desnick does have a pre-existing duty to prepare the cost report, or that the Estate could obtain a release of the Medicare/Medicaid claim even without such a report, the court would agree that Desnick's promise to employ his "best efforts" has little, if any, value as consideration for the Settlement.

LaSalle's remaining concerns regarding the Medicare/Medicaid claim do not require extensive discussion. LaSalle points out that if the Estate is not successful in negotiating a release of that claim,

---

[19]    Specifically, Costello testified that the attorneys working to release the claim have advised him that "the vast majority of the [Medicare/Medicaid reimbursement recovered by the Hospital] can be justified with documents that we have now or can be obtained from the State of Illinois without filing a cost report." (Transcript (Day 3), at 10.)

25

the amount of unsecured claims against the Estate increases from an estimated $11 million to approximately $24.5 million. (Deposition of John Costello, Ex. 4 to Appellant's Brief, Tab A, at 48-49). In this court's view, the fact that the Medicare/Medicaid claim, if not withdrawn, will dilute the recovery of the unsecured creditors is unfortunate, but ultimately irrelevant to this court's inquiry. As discussed above, in determining whether a proposed settlement is in the best interests of the estate, a court must (1) compare the terms of the settlement with the "probable costs and probable benefits" of the litigation, and (2) determine whether the terms of the proposed settlement fall within the "reasonable range of litigation possibilities." *Telesphere Communications, Inc.*, 179 B.R. at 553 (citations omitted). A court is not authorized to compare the settlement with the outstanding claims against the estate in determining the propriety of the settlement. Indeed, as discussed above, LaSalle itself has accused the bankruptcy court of employing just such a test, and argued that doing so constituted an abuse of discretion. (Appellant's Brief, at 13-15.)

Second, LaSalle objects to a provision that would permit Desnick to share in the proceeds of any additional payment that a completed cost report might reveal are owed to Doctors Hospital.[20] Importantly, both sides view such a possibility as extremely remote. Indeed, after its previous protests that the Estate is absolutely barred from filing a late cost report and obtaining a release, LaSalle's complaints regarding Desnick's potential recovery if that does happen lacks resonance. Moreover, the Settlement allows Desnick to recover these funds only if the Medicare/Medicaid claim is withdrawn in its entirety and negotiations lead to further payments to the Estate from DHHS. If this

---

[20]     Desnick believes that, in addition to obtaining a release of the $13.4 million claim, Doctors Hospital may be able to recover additional amounts from DHHS if and when the final cost report is submitted. (Deposition of James Desnick, Ex. 4 to Appellant's Brief, Tab C, hereinafter Desnick Deposition, at 201-02.)

occurs, under the Settlement, the first $3 million recovered would be split equally between Doctors Hospital and Desnick, with Doctors Hospital receiving any amounts exceeding $3 million. (Settlement, ¶ 10.) Appellant urges that, in this event, Desnick's contribution would effectively be reduced to $4.5 million. While this is true in some sense, Desnick will recover only if the Estate itself is also able to recover funds from DHHS. In this court's view, the possibility of some recovery for himself creates an added incentive for Desnick with respect to the cost report.

LaSalle does not cite any support for its contention that a bankruptcy court may never approve a Settlement in which a wrongdoer may potentially recover some of its consideration if he later provides a post-settlement benefit for the estate. However unseemly the possibility of Desnick recovering any amount from DHHS, this possibility does not reduce the value of the Settlement for the Estate and its unsecured creditors.

In sum, the bankruptcy court did not assess great value to Desnick's promise to work to obtain a release of the Medicare/Medicaid claim. Neither does this court. The fact that the bankruptcy court declined to discount the promise entirely was not an abuse of discretion.

### 2. Value of the Daiwa Settlement

In its decision, the bankruptcy court also noted the value of Desnick's waiver of any claims he has against the Estate, including any subrogation rights he obtained by paying the Daiwa Loan. LaSalle now argues that the court erred in assigning value to this waiver. Specifically, LaSalle claims that the Daiwa claim has already been released and that Desnick has no subrogation rights stemming from his payment of the Daiwa loan. (Appellant's Brief, at 21-22.) In support, LaSalle cites Desnick's deposition testimony, in which he suggested that the Daiwa claim "was already a non-issue," and that any claims against the Estate arising out of the Daiwa loan had been released by

27

March 31, 2004. (Desnick Deposition, at 48-49.) Additionally, LaSalle notes that even if Desnick had not released the claim, Costello admitted that the claim would be subject to equitable subordination. 11 U.S.C. § 510(c). As a result, Appellant urges that Desnick's waiver added no value to the Estate. (Appellant's Brief, at 22.)

In response, the Estate notes that Desnick is not an attorney, and that his testimony cannot fairly be interpreted as extinguishing subrogation rights he obtained by paying the Daiwa loan. Subrogation does not depend on the existence of an agreement; "equitable subrogation can arise simply from the fact of payment." *Mutual Service Casualty Ins. Co. v. Elizabeth State Bank*, 265 F.3d 601, 626 (7th Cir. 2001) (citations omitted). If a creditor proceeds against a guarantor, "the guarantor is then subrogated to the rights of the creditor, having an unpaid claim against the corporation." *Weissman v. Weener*, 12 F.3d 84, 87 (7th Cir. 1993).

The Trust contends, however, any claims brought by Desnick, as a creditor or through subrogation, may be subject to equitable subordination. The doctrine of equitable subordination grants courts broad discretion to subordinate the claims of insider creditors where: (1) the claimant has engaged in some type of inequitable conduct; (2) the misconduct resulted in injury to other creditors or conferred an unfair advantage to the claimant; and (3) equitable subordination is not inconsistent with the provisions of the Bankruptcy Code. *Matter of Lifschultz Fast Freight*, 132 F.3d 339, 344 (7th Cir. 1997), *citing In re Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir. 1977); 11 U.S.C. 510(c). In *Lifschultz*, a bankruptcy trustee requested that the bankruptcy court equitably subordinate an insider's secured claim (arising out of a loan made to the corporation) on the basis that the corporation had been undercapitalized. *Id.* at 343. The court held that equitable subordination was not appropriate, however, because there had been no misconduct by the insider. *Id.* at 349. LaSalle

asserts that Desnick's conduct as sole shareholder and director of Doctors Hospital presents a strong case for equitable subordination of his claims.

Again, LaSalle has not shown that the bankruptcy court erred in its valuation of the Desnick release. The bankruptcy court did not give much weight to the Desnick release in approving the Settlement. On its value, Judge Doyle stated: "Although LaSalle contests the validity of [Desnick's subrogation rights], [LaSalle] provides no support for [its] position. At a minimum this settlement saves Doctors Hospital a legal battle on this issue." Oral Ruling, at 15. This court need not delve too deeply into the subrogation and equitable subordination issues, as Judge Doyle appears to have valued the release at little more than the potential cost of litigating these matters.

C.      Settlement with Remaining Individual Defendants

Finally, Appellant urges that the bankruptcy court erred in approving the Settlement insofar as it includes sixteen other Defendants, besides Desnick, none of whom paid any consideration for their release. Appellant argues that there was "no basis" for releasing these other Defendants, other than Desnick's demand for their release as part of the Settlement. (Appellant's Brief, at 23.) The Estate contests this conclusion on two grounds. First, the Estate notes that twelve of these sixteen Defendants consist of corporate entities owned or controlled by Desnick.[21] Moreover, Desnick has agreed to indemnify the remaining four Defendants–three financial officers and one former director of Doctors Hospital–under the terms of an AIG insurance policy. (Transcript (Day 3), at 89.) This

---

[21]      The twelve Defendants: (1) Barry Harlem Corp.; (2) J.H. Desnick, M.D. Eye Services Ltd.; (3) James H. Desnick, M.D., S.C.; (4) James H. Desnick, M.D., P.A.; (5) Desnick Descendants Irrevocable Trust; (6) Desnick Family Irrevocable Trust; (7) HP Membership, Inc.; (8) HPCH LLC; (9) HPCH Partners, L.P.; (10) Leger Acquisition Corp.; (11) Medical Management of America, Inc.; (12) Stony Island Ventures, Inc.  (Settlement, at 1.)

indemnification arose out of an August 2003 agreement in which AIG paid Desnick approximately $5.4 million based on Doctors Hospital's last two directors and officers liability insurance policies ending August 1999 and August 2000, and Desnick agreed to indemnify AIG and the other officers for any claims against them. (Transcript (Day 1), at 58; Letter from Arent, Fox, Kintner, Plotkin & Kahn, PLLC to AIG dated Aug. 8, 2003, at 1-3.) Thus, Desnick would be responsible for any recovery obtained against any of these sixteen Defendants. (Id.) Given this possibility, the Estate argues, these parties had to be a part of any Settlement with Desnick. (Appellee's Brief, at 21-22.) Furthermore, the Estate notes that the same insolvency analysis applies to the claims against these other Defendants as applies to the Desnick claims.[22]

The court agrees that, given Desnick's financial liability for any claims against these sixteen Defendants, the Estate's decision to release its claims against them was reasonable. Importantly, the liability of these companies stems from the same transactions that are the basis of the claims against Desnick. Any potential recovery on these claims depends on the ability of the Estate to establish the date of insolvency. If, as discussed below, the Estate is not able to establish insolvency until after the Nomura Loan, then the potential recovery is limited to approximately $1.8 million, regardless of whether the Estate proceeds against all of these entities or against Desnick alone.

## IV.     Likely Litigation Outcome

Having reviewed Judge Doyle's evaluation of the Settlement agreement at little more than the $6.1 million cash payment, the court now turns to review her analysis of the potential litigation

---

[22]         This is true for all remaining settling Defendants with the exception of Leger Acquisition Corp, against whom the Estate's claim is based on the value of the dispute parking lot. (Transcript (Day 2), at 44.) The Estate is receiving the net sale value of the lot as part of the Settlement.

outcomes. The Trust raises two fundamental challenges to the bankruptcy court's estimation of the likely outcome of the Doctors Hospital lawsuit. First, LaSalle argues that the Estate's insolvency analysis is incorrect, and that the court erred in accepting it. (Appellant's Brief, at 26-29.) Second, LaSalle urges that the court incorrectly valued the potential litigation outcomes by failing to consider the likelihood that the Estate will be able to recover the proceeds of the Nomura Loan. (*Id.* at 30-32.) Again, the court addresses these arguments in turn.

## A.     Date of Insolvency

As discussed above, under the main theories on which the Estate proceeds–breach of fiduciary duty, fraudulent transfer, and conversion–recovery is limited to those transactions occurring after the point of insolvency. Specifically, for claims of breach of fiduciary duty, a corporate officer or director owes a fiduciary duty only to the corporation and its shareholders while the company remains solvent; once a company becomes insolvent, however, "'the assets of the corporation must then be regarded as a trust fund for the payment of all its creditors and the directors occupy the position of trustees and fiduciaries.'" *Technic Engineering, Ltd. v. Basic Envirotech, Inc.*, 53 F. Supp. 2d 1007, 1011 (N.D. Ill. 1999), *quoting Coleman v. Howe*, 154 Ill. 458, 467, 39 N.E. 725, 727 (1895).

In its reply brief, Appellant asserts for the first time that, as a director and sole shareholder of Doctors Hospital, Desnick owed a fiduciary duty to the corporation itself, and that this duty does not hinge on the insolvency analysis. (Appellant's Reply Brief, at 10-11.) Appellant is correct that prior to insolvency, Desnick, as a director, owed a fiduciary duty to both the shareholders (i.e. himself) *and* the corporation itself. *Technic*, 53 F. Supp. 2d at 1010 (Illinois courts have "'long recognized that corporate officers and directors occupy a fiduciary relationship towards their corporation and shareholders.'"), *quoting Brown v. Tenney*, 125 Ill. 2d 348, 360, 532 N.E. 2d 230, 235

31

(1988); *Rexford Rand Corp. v. Ancel*, 58 F.3d 1215, 1218 (7th Cir. 1995) ("Under Illinois law, a shareholder in a close corporation owes a duty of loyalty to the corporation itself and to the other shareholders."), *citing Hagshenas v. Gaylord*, 199 Ill.App. 3d 60, 70, 557 N.E. 2d 316, 323 (1990). LaSalle's assertion that Doctors Hospital has "chosen to ignore this law" is unfair, however. (Appellant's Reply Brief, at 11.) The Trust itself never argued to the bankruptcy court that the date of the Hospital's insolvency is irrelevant. In her opinion, Judge Doyle characterized the date of insolvency as the "biggest issue" in assessing the value of the fraudulent transfer and breach of fidiciary duty claims. Oral Ruling, at 8. LaSalle did not challenge this analysis in its opening brief to this court, instead arguing that, if a later insolvency date prevailed, the Estate could recover the Nomura Loan proceeds in its action against Desnick. (Appellant's Brief, at 29.) Whatever the merits of the Trust's suggestion that the insolvency date is irrelevant, LaSalle is barred from making such an argument now. *See Giffin v. Summerlin*, 78 F.3d 1227, 1231 (7th Cir. 1996) (Argument raised for first time in reply brief is waived); *Parrillo v. Commercial Union Ins. Co.*, 85 F.3d 1245, 1250 (7th Cir. 1996) (same).

No such confusion surrounds the insolvency analysis for the fraudulent transfer claims. Under the Illinois Uniform Fraudulent Transfer Act, "[w]hen a person transfers money or other property to another person without receiving anything in return, and the transferor is insolvent (or made insolvent by the transfer), the transfer is voidable even if there was no intent to hinder creditors." *Nostalgia Network, Inc. v. Lockwood*, 315 F.3d 717, 719 (2002) (citations omitted); 740 ILCS 160/6(a). Similarly, § 548 of the Bankruptcy Code permits a bankruptcy trustee to avoid as fraudulent any transfers if the trustee can show: (1) the debtor had an interest in the property; (2) the transfer occurred within one year of the filing of a bankruptcy petition; (3) the debtor was

32

insolvent at the time of the transfer, or became insolvent as a result of it; and (4) the debtor received "less than a reasonably equivalent value in exchange for such transfer." 11 U.S.C. § 548; *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 535 (1995).

Similarly, the parties and the bankruptcy court are in agreement that the Estate cannot maintain a conversion claim against Desnick involving any transactions occurring prior to insolvency. A shareholder may not be held liable for conversion of corporation assets when his acts have been ratified by all of the corporation's shareholders. *Field v. Lew*, 184 F. Supp. 23, 27 (E.D. N.Y. 1960), *Dannen v. Scafidi*, 75 Ill. App. 3d 10, 16, 393 N.E. 2d 1246, 1251 (1979), *citing Id*; *Daniels v. Powell*, 604 F. Supp. 689, 698 (N.D. Ill. 1985). After the point of insolvency, however, the parties agree that Desnick could be held liable for converting corporate assets properly belonging to the Estate's creditors. The rationale for this distinction is clear enough: "The sole shareholder who defrauds or mismanages his own corporation hurts only himself. For the corporation to sue him for his wrongs is simply to take money out of his right pocket and put it in his left." *Bargor Punta Operations, Inc. v. Bangor & A.R. Co.*, 417 U.S. 703, 721 (1974).

Appellant argues that the bankruptcy court erred in concluding that the Estate would likely not be able to establish insolvency because the Estate's insolvency analysis was incomplete, based on "estimates and assumptions," and without evidentiary support. (Appellant's Brief, at 27.) This is simply not true. Costello testified that the Estate believed it could establish insolvency as early as January 1, 1997, based on the AmEx Report, (Transcript (Day 1), at 19-20), but he recognized that doing so might be difficult in light of substantial evidence pointing to a later date of insolvency. The Navigant Report, for example, estimated the date of insolvency as September 30, 1998. (*Id.* at 27.)

33

In addition, the annual audits conducted by KPMG made no mention of insolvency during the years 1996 through 1999. (Ex. 17 to Appellant's Brief.)

In light of these reports, the assertion that the Estate's insolvency estimation lacked evidentiary support is groundless. Moreover, Appellant's complaint that these reports are preliminary is of no substance. (Appellant's Brief, at 27.) In estimating the value of a proposed settlement and the likely outcome of litigation, "a precise determination of likely outcomes is not required, since 'an exact judicial determination of the values in issue would defeat the purpose of compromising the claim.'" *Telesphere*, 179 B.R. at 553, *quoting Energy Co-Op.*, 886 F.2d at 929.

Appellant is correct in noting that nothing mandates an "all or nothing theory" of insolvency, in which the date of insolvency was either January 1, 1997, under the AmEx Report, or September 30, 1998, under the Navigant Report. (Appellant's Brief, at 28.) Given the Navigant Report, as well as the KPMG audits, however, a reasonable trier of fact could have concluded that Doctors Hospital remained solvent until at least September 30, 1998. In concluding that there was a substantial possibility that the Estate would not be able to establish an earlier insolvency date, the bankruptcy court also noted that the Trust has itself contended that Doctors Hospital was in fact solvent on August 28, 1997, because otherwise its $64 million claim relating to the Nomura Loan would be eliminated. Oral Ruling, at 18. Therefore, in assessing the "reasonable range of litigation outcomes," the court appropriately looked to this date in determining the "lowest point in the range of reasonableness." *Telesphere*, 179 B.R. at 553 (citations omitted).

## B. Low Range of Reasonable Litigation Outcomes

In light of the possibility that Doctors Hospital could be deemed solvent through September 1998, the bankruptcy court fixed the low end of reasonable litigation outcomes at $1.8 million,

representing the net amount of transfers from Doctors Hospital to Desnick or the Desnick entities occurring after September 30, 1998. Oral Ruling, at 9. Appellant disputes this conclusion, arguing that if this later date of insolvency prevails, the Estate can sue to recover the proceeds of the Nomura Loan. Thus, Appellant asserts that the low end of reasonable litigation outcomes is actually the $34 million figure set out by the bankruptcy court as the *upper* range, to be recovered by the Estate only if it can prove insolvency as of January 1, 1997, before the bulk of the Desnick transfers.

The Estate insists that complaint does not seek recovery of the Nomura Loan proceeds, but rather merely seeks to void the hospital's Guaranty of that loan to the Trust. (Appellee's Brief, at 28.) Nevertheless, the Trust contends that, if this later insolvency date prevails, the Estate has set out a *prima facie* claim to recover the $48 million loan proceeds on the grounds that Desnick "converted money that was clearly intended to go toward improving the hospital." (Appellant's Brief, at 29.) In addition, Appellant claims that the Estate could have and should have brought an action to recover the loan proceeds under an alter ego theory.

### 1.    Existing Conversion and Breach of Fiduciary Duty Claims

Having reviewed the Estate's complaint, the court concludes that the Estate's breach of fiduciary duty claims seek only to void the Hospital's guaranty of the Nomura Loan. Count I against Desnick, for breach of fiduciary duty, alleges that, inter alia, that Desnick caused Doctors Hospital to "guaranty the full amount of the Nomura Loan." (Count I.) It does not, however, refer to the proceeds of the Nomura Loan, nor allege that Desnick breached his fiduciary duty by taking the proceeds of the Nomura Loan. In addition, as this court reads the complaint, the "Loan Transfers" referred to in the conversion claim against Desnick refer to loans made by Doctors Hospital to Desnick personally, not to the proceeds of the Nomura Loan. (Count XXVII.)

35

Regarding these claims, the bankruptcy court noted that the Estate could not pursue Desnick for breach of fiduciary duty or conversion related to the loan, because both of these theories would require proof of insolvency at the time of the Nomura Loan. Oral Ruling, at 12. As sole shareholder of Doctors Hospital, Desnick did not owe a fiduciary duty to creditors prior to insolvency. *In re Joy Recovery Technology Corp.*, 286 B.R. 54, 81 (Bankr. N.D. Ill. 2002), *citing Technic*, 53 F. Supp. 2d at 1010-11. Prior to insolvency, the court concluded that "Desnick would be the only shareholder to suffer damage from his own transfers . . . [so that] the validity of any such claim is at least questionable." Oral Ruling, at 12. Appellant does not challenge this legal conclusion,[23] but rather argues that since the insolvency analysis is incomplete, there is no basis for concluding that these claims are not viable. (Appellant's Brief, at 31-32.) As discussed above, however, the Estate presented substantial evidence regarding the possible date of insolvency. In deriving the low range of reasonable litigation outcomes, the court properly looked to the least favorable insolvency date that would likely be proved in litigation. Moreover, as discussed below, the Estate's decision not to pursue the Nomura Loan proceeds was not only reasonable, but in the best interest of the Estate as a whole.

## 2. Potential Alter Ego Claims

Regarding the potential alter ego claim against Desnick, the bankruptcy court concluded, as noted earlier, that there were "many legitimate reasons" for the Estate's decision not to bring such a claim. Specifically, the court reiterated Costello's belief that establishing alter ego liability would

---

[23]     As discussed above, the argument raised for the first time in the Trust's reply brief—that Desnick can be pursued without regard to the date of insolvency—to the extent it has merit, is waived.

be difficult because Doctors Hospital and HPCH were "not sufficiently entwined" and "it would be difficult to prove that outside parties were confused about with which entities they were dealing." Oral Ruling, at 11. In addition, the bankruptcy court noted that if the Estate succeeded in establishing alter ego liability, the Trust's claim against the Estate based on the Guaranty (which the Estate is trying to void as a fraudulent conveyance) "would be replaced by the direct loan obligation owed by HPCH to the Trust, swamping the other unsecured creditors of [the Estate] who had no link to the misguided loan." Id.

This court need not dwell on the merits of an "alter ego" claim against Desnick and HPCH.[24] In the circumstances presented here, this court agrees with the bankruptcy court that the Estate's decision not to seek recovery of the Nomura Loan proceeds was a reasonable one. As the bankruptcy court noted, success on an alter ego claim might well render the Estate liable for the $64 million claim that Appellant, as successor to the lender, currently maintains against HPCH for losses related to the Nomura Loan. Thus, the Estate's creditors would actually be in a worse position if the Estate were to recover the Nomura Loan proceeds, because those proceeds would not fully cover the Trust's claims. In light of this potential liability, the decision not to proceed on an alter ego theory appears

---

[24] Such a claim might have more traction than the Estate suggests. Under Illinois law, a corporate entity will be disregarded when: (1) there is "such unity of interest and ownership that the separate personalities of the corporation and the individual [or other corporation] no longer exist" and (2) "adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Van Dorn Co. v. Future Chemical and Oil Corp.*, 753 F.2d 565, 569-70 (7th Cir. 1985) (citations omitted); *Hystro Products, Inc. v. MNP Corp.*, 18 F.3d 1384, 1388-89 (7th Cir. 1994). The court is uncertain that under Illinois law a plaintiff must also show that third parties were confused in order to proceed on an alter ego theory. The Estate could argue that Desnick controlled both Doctors Hospital and HPCH at the time of the Nomura Loan, and he used this control to obtain what was effectively a $50 million personal loan, secured by the assets of these two corporations in an arguably fraudulent manner.

37

to be in the best interests of the estate. At a minimum, the bankruptcy's conclusion on the matter was not clearly erroneous.

## C.     Range of Litigation Possibilities

Given the reasonableness of the Estate's decision not to pursue the Nomura Loan proceeds, this court agrees with the bankruptcy court's $1.8 million estimate of the low range of reasonable litigation outcomes. In addition, the court concurs with the bankruptcy court's $34 million estimate of the upper range of reasonable litigation outcomes.[25] In turning to the question of whether the Settlement is in the best interests of the estate, the court must examine whether it falls within the "reasonable range of litigation possibilities." *Energy Co-Op., Inc.*, 886 F.2d at 929 (citations omitted). A proposed settlement "fails this test only if it 'fall[s] below the lowest point in the range of reasonableness.'" *Id.*, *quoting In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983). In the present case, the $6.1 million settlement figure well exceeds the $1.8 million figure fixed as the low range of reasonable litigation possibilities.

## V.     Other Objections to Settlement

Even if the Settlement falls within the reasonable range of litigation outcomes, Appellant urges that the bankruptcy court nevertheless erred in approving the Settlement for a number of reasons. First, Appellant argues that the Settlement should be rejected because it "achieves an unjust result." (Appellant's Brief, at 33.) In addition, Appellant claims that: (1) the bankruptcy court erred in giving deference to the Creditors Committee, because its support of the Settlement is unreasonable (*Id.* at 35-41); (2) the Trustee's support for the Settlement is unreasonable, and the

---

[25]     Appellant contends that the upper range is $81 million, presumably because Appellant includes the $48 million proceeds of the Nomura Loan. (Appellant's Brief, at 25.)

court erred in deferring to it (*Id.* at 41-43); and (3) the creditors were not given notice of the actual effect of the Settlement, and thus had no meaningful opportunity to object. (*Id.* at 43-44.)

Notably, "[o]nce there is a showing that the settlement should be approved, the burden then shifts to the objecting party who cannot oppose the settlement by merely demanding more proof." *Del Grosso*, 106 B.R. at 168. "To allow the objectors to disrupt the settlement on the basis of their unsupported suppositions would completely thwart the settlement process." *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 464 (2d Cir. 1974), *quoted in Del Grosso*, 106 B.R. at 168. Thus, after the proponent has shown the settlement to be in the best interest of the estate, the objectors must make a "clear and specific showing that the vital material was ignored" by the court. *Id.* With this in mind, the court will address Appellant's remaining objections.

### A. Settlement Achieves an Unjust Result

In arguing that the Settlement achieves an unjust result, the Trust notes the "gross disparity" between the amount sought to be recovered and the Settlement amount, and urges that this disparity requires that the court exercise its equitable power and reject the Settlement as unjust. (Appellant's Brief, at 34.)

The court disagrees. First, LaSalle compares the $6.1 million settlement figure with the $81 million figure it claims to represent the upper range of possible litigation outcomes, but because the Estate is not seeking to recover the Nomura Loan proceeds, the Trust's $81 million figure is grossly inflated. LaSalle cites *In re Lake City R.V., Inc.*, 226 B.R. 241 (Bankr. D. Idaho 1998), for the proposition that a court should reject a settlement where there is a gross disparity between the amount sought and the settlement amount. The bankruptcy court in *Lake City* rejected the proposed settlement where, in submitting the settlement to the bankruptcy court for approval, the trustee

39

included no explanation beyond a "terse, two paragraph proposal" asking the court for approval. *Id.* at 243. The basis for the court's rejection of the settlement was this failure to provide a "clear and concise explanation" of the relevant facts and circumstances of the settlement, not the insufficiency of the settlement figure. *Id.* The court noted the "gross disparity" between the amount sought and the amount accepted in settlement only as a factor that "underscores the need for the Trustee to explain his thinking and set forth the specific factual and legal reasons why the compromise is in the best interest of creditors and the estate." *Id.* This reading is confirmed by the court's conclusion that a sufficient basis to support the proposed settlement might well exist and its denial of the motion without prejudice. *Id.* at 244.

The Trust cites no authority for the proposition that a court is obligated to reject a settlement as unjust merely because the settlement amount falls well below the maximum potential recovery. Instead, the Seventh Circuit has repeatedly held that the test for review of a bankruptcy settlement is "whether or not the terms of the proposed compromise fall within the reasonable range of litigation possibilities." *Energy Co-Op.*, 886 F.2d at 929. The Settlement at issue here falls within this range.

Finally, the Trust highlights Desnick's culpability and the fact that he remains "unapologetic" about his conduct in running Doctors Hospital. Regardless of the merits of this criticism, LaSalle cites no authority for the notion that Desnick's malfeasance makes the Settlement terms unjust or somehow alters the test for examining the Settlement. Unfortunate as it may seem, Desnick's culpability and behavior is not relevant to the task of analyzing the terms of the Settlement and its fairness to the Estate and its creditors.

## B.    Creditors Committee's Support For Settlement Was Unreasonable

LaSalle urges that the bankruptcy court abused its discretion by giving deference to the opinion of the Creditors Committee. Although it admits that it is proper for a court to defer to the views of a creditors committee, the Trust argues that such deference was improper in this case because the view of the Creditors Committee "fails to meet the standard of reasonableness," in light of the Committee's lack of involvement in the settlement process. (Appellant's Brief, at 35.)

Again, the court is unpersuaded. First, LaSalle's argument focuses on the deposition of Dean Pasquini, the Chairman of the Creditors Committee, which it maintains shows that Pasquini and the Committee knew little or nothing about the Settlement or the underlying lawsuit. Pasquini's testimony demonstrates that he and the other Committee members largely relied on the advice of their counsel in deciding to support the Settlement. The Committee's reliance on its attorney to guide it through a complex legal issue simply does not support the Trust's conclusion that the Committee was "hopelessly non-functional."[26] (Appellant's Brief, at 36.) The bankruptcy court observed that the Committee "expressed its view through its able counsel, and its view is entirely reasonable in light of the court's finding above." Oral Ruling, at 15-16. Appellant cites no authority for the proposition that such reliance by lay participants on legal counsel is inappropriate or renders the Creditors Committee's support for the Settlement suspect.

---

[26]    Unfortunately, LaSalle has misrepresented or mischaracterized a number of aspects of Pasquini's deposition and Costello's testimony. For example, LaSalle asserts that Pasquini did not know certain details about the lawsuit or Settlement, where in fact he merely stated that he did not recall the details or where the questions called for legal conclusions. (Deposition of Dean Pasquini, Ex. 4 to Appellant's Brief, Tab B, at 66, 71, 86.)

Second, Appellant's argument ignores the substantial evidence indicating that the Creditors Committee played an active role in settlement negotiations. During the bankruptcy hearing, Costello testified that representatives of the Creditors Committee were present at a series of eight to ten meetings at which the Hospital's bankruptcy, the Desnick transactions, and possible theories of recovery were addressed. Representatives of the Creditors Committee also attended the six to eight negotiating sessions leading up to the Settlement. After the Settlement had been approved in principle, the Trust itself notified the Committee of perceived improprieties concerning the Settlement terms; the Committee again convened a special meeting, to discuss the Trust's objections. (Transcript (Day 1), at 85-89.) Given this extensive involvement in the settlement process, it can hardly be said that the Creditors Committee did not adequately fulfill its oversight role.

In any event, the bankruptcy court did not base its approval of the Settlement solely on the support of the Creditors Committee. Rather, the court merely rejected Appellant's assertion that it should not consider the Committee's opinion by noting that it had expressed its views and that those views were reasonable. Nothing in the bankruptcy court's opinion suggests that its approval of the Settlement unduly relied on the views of the Creditors Committee.

C.    Trustee's Support for the Settlement was Unreasonable

Similarly, LaSalle argues that the bankruptcy court erred in giving deference to the Trustee's support for the Settlement. As evidence that the Trustee's position was unreasonable, LaSalle cites the Trustee's failure to conduct an independent investigation of the facts surrounding the case and Settlement, as well as his failure to fully set out his reasons for supporting the Settlement.

Again, as an initial matter, Appellant's argument fails in light of the fact that the bankruptcy court did not base its decision on the Trustee's support for the Settlement. The case cited by LaSalle

42

for this proposition, *In re Churchfield*, 277 B.R. 769, 773 (Bankr. E.D. Cal. 2002), states that: "While the opinion of the Trustee is entitled to great weight, the bankruptcy court has a duty to make an informed, independent judgment as to the reasonableness of the proposed compromise." Judge Doyle's opinion demonstrates she carried out that duty, and that her approval of the Settlement was not based solely on the recommendation of the Trustee. In fact, the only reference to the Trustee in Judge Doyle's opinion involved a collateral issue: Appellant had "questioned the integrity of [the Estate's] counsel in pursuing Desnick, asserting that they may be tainted because the bankruptcy case was referred to them by Winston & Strawn, who represented [Doctors Hospital] and Desnick at that time." Oral Ruling, at 16. Among the reasons cited in rejecting this argument, the court noted that a "Chapter 11 trustee has recently been appointed, and he has expressed wholehearted support of the proposed settlement." *Id.* At no point did the court indicate that the Trustee's support played any role in its analysis of the merits of the Settlement.

Moreover, Appellant's claim that the Trustee failed to conduct an independent investigation of the claims is misleading. Appellant cites a number of cases for the proposition that "as proponent of the proposed settlement," the trustee "has the burden of establishing that the settlement is fair and equitable and should be approved by the court." *In re Kay*, 223 B.R. 816, 819 (Bankr. M.D. Fla. 1998) (citations omitted); *see also In re Hydronic Enterprise, Inc.*, 58 B.R. 363, 365 (Bankr. D. R.I. 1986). The cases cited, however, all involved situations in which the trustee was the active proponent of the motions to settle. In this case, the bankruptcy court appointed the Trustee after the proposed Settlement had been reached. In light of this late appointment, the Trustee set out to review the available evidence and assess the reasonableness of the proposed Settlement. (Transcript (Day 3), at 54.) LaSalle claims that the Trustee was obligated to provide independent evidence in

support of the Settlement, but cites no authority for imposing such a requirement on a non-moving Trustee.

In fact, it appears that the Trustee did conduct a thorough investigation of the case during the period between his appointment and the hearing. He attended a number of depositions, reviewed all discovery documents, interviewed the parties, investigated the Medicare/Medicaid claim, and interviewed American Express personnel regarding the solvency analysis. (Transcript (Day 3), at 45-48.) In light of his efforts and the lengthy negotiations that preceded the agreement, the court rejects any suggestion that the Settlement was collusive or that the negotiations were mere window-dressing.

### D.    Notice to Creditors

Finally, the Trust claims that the bankruptcy court abused its discretion in approving the Settlement because the creditors were not given notice of the actual effect of the Settlement, and thus had no meaningful opportunity to object. LaSalle here attempts to rehash its previous arguments regarding the reasonable range of litigation outcomes by arguing that Costello, the attorney for the Estate, employed a flawed analysis in reaching an estimate of the reasonable litigation outcomes, and "presumably provided the Creditors' Committee with his flawed analysis when he solicited (or, more correctly, coerced) the Committee's endorsement of the Settlement, and he presumably led the Committee to believe, incorrectly, that the maximum amount of recoverable damages was $14 million." (Appellant's Brief, at 44.)

The court does not share these presumptions. First, there is no evidence suggesting that Costello ever advised the Committee that the maximum amount of recoverable damages was $14 million. Instead, this $14 million figure was discussed not as an estimate of possible recovery, but as

44

an approximate value of outstanding claims of unsecured creditors. (Transcript (Day 2), at 11; Appellee's Brief, at 11, 39; Appellant's Brief, at 13-14.) Moreover, Appellant's suggestion that "not one single creditor (other than the Trust) had an opportunity to analyze the Settlement using the correct standard" is incorrect. (Appellant's Brief, at 44.) The Trust's special servicer for the Nomura Loan, Orix Capital Markets LLC, itself advised all creditors as to its position on the possible litigation outcomes. In a letter dated May 13, 2004, Orix warned the creditors that the creditors would only obtain $1.7 million under the proposed Settlement in exchange for the dismissal of $81 million worth of claims against Desnick and the other Defendants. (Letter from Orix Capital Markets, LLC to Creditors Committee, dated May 13, 2004, Ex. 2, Tab 25 to Appellee's Brief, at 3-4.) As noted, the Committee met again to discuss the merits of those objections, and then voted again to approve the Settlement. (Transcript (Day 1), at 85-89.)

At bottom, the Trust's challenges to the conduct of the Trustee and the Creditors Committee are no more than an attempt to reargue the merits of the reasonable-range-of-litigation-outcomes analysis. No further analysis of these agreements is warranted.

## CONCLUSION

The $6.1 million settlement figures falls within the reasonable range of possible litigation outcomes. As a result, the bankruptcy court's conclusion that the Settlement is in the best interests of the Estate and ultimate approval of the Settlement was not erroneous. The decision of the bankruptcy court is affirmed.

ENTER:

Dated: July 21, 2005

REBECCA R. PALLMEYER
United States District Judge

45